54 CCPA

**Application of Robert JOLY and Julien Warnant.**

**Patent Appeal No. 7472.**

United States Court of Customs and Patent Appeals.

March 16, 1967.

Dissenting Opinions April 10, 1967.

Smith and Rich, JJ., dissented.

Jennings Bailey, Jr., Washington, D. C. (Nelson Littell, Jr., Charles A. Muserlian, New York City, of counsel), for appellants.

Joseph Schimmel, Washington, D.C. (Jack E. Armore, Washington, D.C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, SMITH, and ALMOND, Judges, and Judge WILLIAM H. KIRKPATRICK.*

ALMOND, Judge.

This is an appeal from the decision of the Board of Appeals affirming the rejection of product claims 1 to 3 and process claims 8 to 12 of appellants' application serial No. 81,272, filed January 9, 1961, entitled "Esters of 2-Enols of $\Delta^1$ Steroids and Preparation Thereof."

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

Generic product claim 1 is illustrative:

1. A compound having the formula

wherein X is selected from the group consisting of hydrogen and methyl, Y is selected from the group consisting of hydrogen and an acyloxy radical of a lower organic carboxylic acid having 1 to 7 carbon atoms and Y' is an acyl radical of a lower organic carboxylic acid having 1 to 7 carbon atoms.

Composition of matter claims 2 and 3 are directed to specific compounds, 2,21-diacetoxy - $\Delta^1$- pregnene - 17$\alpha$ - ol - 3,11,-20-trione and 2-acetoxy-16$\alpha$-methyl- $\Delta^1$-pregnene-17$\alpha$-ol-3,11,20-trione, respectively. Claims 8 to 12 are directed to a process for the manufacture of the claimed steroids, which appellants disclose in their specification to be "useful as intermediates" in the following terms:

> The products obtained by the invention, the lower organic carboxylic acid esters of enols in the 2-position of $\Delta^1$-steroids, are particularly useful as intermediates in the preparation of steroids, especially steroids having a ketone group in the 2-position, such as 21 - acetoxy - pregnane - 17$\alpha$ - ol - 2,-3,11,20-tetraone and 16$\alpha$-methyl-pregnane-17$\alpha$-ol-2,3,11,20-tetraone by acid hydrolysis and customary separation steps.

The Board of Appeals rejected all claims for appellants' failure to satisfy the requirements of 35 U.S.C. §§ 101 and 112. Here, as in In re Kirk, 376 F.2d 936, 54 CCPA ——, decided concurrently, we are primarily concerned with the ade-

quacy in law of the aforementioned assertions of usefulness in appellants' original application. Here, too, we are particularly concerned with the applicability of the decision of the Supreme Court in Brenner v. Manson, 383 U.S. 519, 86 S.Ct. 1033, 16 L.Ed.2d 69, to the present facts.[1]

In their memorandum on reargument, appellants concede that, in view of Brenner v. Manson, the appealed process claims should not be found allowable unless we find the claimed compounds produced by that process to be "useful" under section 101. It is to that issue that we direct our attention.

The examiner finally rejected all claims for "insufficient disclosure of utility." Analyzing the above disclosure in appellants' specification, he stated:

> * * * the applicants have stated only that the [claimed] final products may be converted to the corresponding 2-keto compounds, *which compounds have no known utility.* * * * [Emphasis supplied.]

The board agreed, adding:

> The portions of the specification * * * show that the claimed compounds can be used to prepare the corresponding 2,3-keto compounds. *Having arrived at that point, what has been accomplished?* Appellants do not assert that the latter compounds have known utility * * *.
>
> * * * * * *
>
> * * * such conversion does not constitute a disclosure of utility for the claimed compounds because there is no disclosed utility nor any indication of a known utility for the 2,3-keto derivatives. *A useless product does not become useful by virtue of conversion into another useless product.* [Emphasis supplied.]

Appellants do not contend that a use for the claimed compounds, other than as

---

1. This appeal was originally argued October 8, 1965, some five months prior to the decision in Brenner v. Manson on March 21, 1966. On November 10, 1966, this court restored the appeal to the cal-

endar for reargument, and requested counsel to file memoranda "on the effect, if any, of Brenner v. Manson * * * on this appeal." Argument on that question was heard December 5, 1966.

starting materials or intermediates in a process of making other compounds, was either known or obvious to one of ordinary skill in the art at the time their application was filed. Rather, they urge that the claimed esters are "useful as intermediates" in the preparation of certain 2,3-diketo steroids. Although appellants admit that "no specific utility is stated" for the two named 2,3-diketo steroids[2] which can be produced from the compounds of claims 2 and 3, they contend that those diketo compounds are "closely related" in chemical structure to compounds of known usefulness, viz. cortisone and prednisone. Appellants argue that "[t]he disclosure of a steroid as useful as an intermediate to make other steroids by specific disclosed reactions is an adequate disclosure of utility."

We do not accept those arguments. There is no evidence of record that the particular 2,3-diketo steroids which can be obtained from the claim compounds possess *properties* or *activities* in common with the allegedly "closely related" compounds having known useful properties, cortisone and prednisone. Similar arguments were presented to, and rejected by, the Supreme Court in Brenner v. Manson, 383 U.S. at 531–532, 86 S.Ct. 1033, and this court in In re Kirk where we stated:

> It cannot be presumed that a *steroid* chemical compound is "useful" under § 101, or that one of skill in the art will know "how to use" it, simply because the compound is closely related only in a structural sense to other steroid compounds known to be useful. * * *

Nor do we agree that the mere disclosure that a claimed chemical compound may be used as an intermediate to make other compounds, *without regard* for the usefulness of the latter compounds, is adequate under section 101. As we stated in In re Kirk:

> * * * the conclusion is inescapable that, just as the practical utility of the compound produced by a chemical process "is an essential element" in establishing patentability of the process, [Brenner v. Manson] 383 U.S. 519, [86 S.Ct. 1033,] so the practical utility of the compound, or compounds, produced from a chemical "intermediate," the "starting material" in such a process, is an essential element in establishing patentability of that intermediate. It seems clear that, if a process for producing a product of only conjectural use is not itself "useful" within § 101, it cannot be said that the starting materials for such a process—i. e., the presently claimed intermediates—are "useful." It is not enough that the specification disclose that the intermediate exists and that it "works," reacts, or can be used to produce some intended product of no known use. Nor is it enough that the product disclosed to be obtained from the intermediate belongs to some class of compounds which now is, or in the future might be, the subject of research to determine some specific use. * * *

---

2. In a letter dated April 6, 1962, appellants urged before the Patent Office that the 2,3-diketo steroids in turn "are known to be useful in the formation of A-nor steroids." Insofar as the record shows, no evidence or argument was presented at that time or any other time in the proceedings below that any "A-nor steriod" which might ultimately be produced from the claimed compounds would itself be a useful product, the board noting:

> * * * there is nothing to indicate that the derivative dicarboxylic acid compounds or the ultimate A-nor compounds have any utility. * * *

Appellants argue here that the particular 2,3-diketo steroid which is prepared from the compound of claim 2 can itself be used to prepare a compound of "recognized therapeutic activity," A-nor cortisone. They rely on certain documentary material in their brief, not part of the evidence before the Patent Office, to support the proposition that A-nor cortisone, known to be useful at the time of filing their application, can be prepared from the claimed compounds. We have not considered that "evidence." See In re Cofer, 354 F.2d 664, 53 CCPA 830.

We conclude that appellants have not discharged their burden to show that the claimed subject matter is "useful" within the requirements of section 101.

The decision is affirmed.

Affirmed.

RICH, Judge.

### Notice of Forthcoming Dissenting Opinion

I, like Judge Smith, whose sentiments I share, am now revising a dissenting opinion to cover this case and the companion Kirk case (376 F.2d 936, 54 C.C.P.A. ——.), argued together December 5, 1966, and involving similar issues. I initially filed my tenative dissenting opinion in *Kirk* February 1 in response to a December 22 majority opinion therein and a January 24 opinion herein. Thereafter the majority opinion herein was 75% rewritten on February 8 and again, on February 20, its content, responsive in part to observations in my dissent, was reduced 50%. In the ensuing three weeks the court has conferred on a long agenda of cases and held a week of hearings March 6–10, upon the conclusion of which I resumed, on March 13, my revision of the dissent. On that day notice was given by the Chief Judge that these two cases "will go down Thursday, March 16."

Protest to the arbitrary use of assumed power having proved futile, this unprecedented display of unseemly haste, condoned by the majority, necessitates this notice.

SMITH, Judge (dissenting).

Our usual practice is to release the majority opinion simultaneously with any dissenting opinions. There has been an unwarranted departure from this procedure in this case, the effect of which is to preclude an expression of my views at this time. I am unable to see wherein the cause of justice is served by such an irregular procedure. This dissent is therefore 1) a protest to the procedure here adopted, and 2) a notice that my full written dissent will be forthcoming as soon as the pressures of court work permit.

WORLEY, Chief Judge (specially concurring).

It is most regrettable that for the first time in the history of this court, the usual orderly processes of the court have been ignored by a minority.

The instant appeal was *re-argued* December 5, 1966. The majority opinion was circulated February 20 in its present form. Yet, now, nearly one month later, the dissenting opinions are not available and no valid excuse is given.

It would seem that if the majority can direct its time and attention to expediting the work of the court it should not be too much to expect the same diligence from the minority.

It should not be necessary to say that the duty of this court is to the litigants, applicants for patents, the Patent Office and the public—not to the possible whims and caprices of individual judges. It is impossible to discharge that duty by condoning the instant derelictions, which hereafter will not be countenanced.

RICH, Judge.

### Notice of Withdrawal

With the filing of the attached dissenting opinion in the above case, I hereby withdraw my "Notice of Forthcoming Dissenting Opinion," dated March 16, 1967 (published in Patent, Trademark and Copyright Weekly Reports for April 3, 1967, 153 USPQ No. 1, at page 47 following the majority opinion herein).

RICH, Judge (dissenting).

I am in general agreement with the views of Judge Smith as stated in his dissenting opinion herein but I have more particularly stated my views in my dissenting opinion in the companion case of In re Kirk, 376 F.2d 936, 54 CCPA ——.

SMITH, Judge.

### Notice of Withdrawal

The attached dissenting opinion shall be substituted for my previous dissenting opinion filed March 16, 1967.

SMITH, Judge (dissenting).

### Introduction

Many of the observations made by Judge Rich in his dissenting opinion in In re Kirk et al. 376 F.2d 936, 54 C.C. P.A. ——, (hereinafter *Kirk*) concurrently released, have particular pertinency here. I am in general agreement with the principles there stated. The majority in the present case rests its opinion on the decision in *Kirk*. Therefore, those portions of the dissents of Judge Rich and myself in *Kirk* which are directly applicable here are incorporated by reference, thus avoiding their needless repetition in this opinion. Here, as in *Kirk*, the majority accepts without question, applies, and extends the dictum in Brenner v. Manson, 383 U.S. 519, 86 S.Ct. 1033, (hereinafter *Manson*) with shocking disregard of the total effect of its decision on patents relating to inventions in the chemical field.

Therefore, I propose to demonstrate in this dissent how the majority opinion changes the intent and meaning of the Patent Act of 1952, and how it amounts to no less than usurpation of the authority exclusively *granted to Congress* by Art. I, Sec. 8, Clause 8, of the Constitution. The majority by its opinions here and in *Kirk* has established a *new* requirement for patentability and it has done this without authority and with nothing but the thin reed of the dictum in *Manson* as its support.[1]

Basically, my disagreement with the majority opinion is predicated on three grounds: (1) It is not supported by the facts of record, (2) It so misconstrues, misapprehends and misapplies the decision of the Supreme Court in *Manson* as to create a direct constitutional conflict, and (3) It deprives appellants of property without due process of law in abrogation of the Fifth Amendment of the Constitution.

The majority's error lies in accepting, apparently without question, what actually is dictum in the *Manson* opinion and in disregarding the decisional law therein. In this case the error arises because the majority ignores certain critical facts of record which were not present in *Manson*. By adopting the qualifying adjectives found in the *Manson* dictum, while ignoring the factual basis upon which this case arises, the effect of the majority opinion is to qualify the meaning of the term "useful" in 35 U.S.C. § 101.

The drastic and far reaching amendment of the statute which results from the majority decision here and in *Kirk* should be the sole responsibility of Congress after due investigation and proper weighing of its effect upon the economy of the United States. Such action is not the proper function of this court.

Judge Rich, in his *Kirk* dissent, has pointed out that the historical policy and interpretation of the patent law, prior to the time of the *Bremner* decision, is contrary to the position of the majority in *Kirk*. For many of the same reasons, this historical policy is contrary to the majority position herein.

Cohen and Schwartz in an article entitled "Do Chemical Intermediates Have Patentable Utility?" 43 JPOS 479 (1961), discuss the history of the so-called "utility requirement" as we are to consider it in the present context. They state:

> Prior to In re Bremner the Patent Office considered that any organic

---

1. It is for this reason I regret the decision to release the opinions prior to consideration of final dissenting views. The observations made by the Chief Judge in his "Specially Concurring Opinion" will not stand analysis. But thirteen court days, extending over a court conference and a week of oral arguments on other appeals, elapsed between the initial circulation of the final majority opinion and the notice that it would be released.

compound could be useful as an intermediate under the rule of Ex parte Watt [63 U.S.P.Q. 163]. However, after *Bremner,* which required that the intended uses be set forth in the specification, the Patent Office departed from its former practice regarding the disclosure necessary to support patentability of chemical compounds. As indicated in the amicus curiae brief of the American Patent Law Association in *Nelson:* Rejections for "lack of utility" now engage much of the time of the Patent Office and practitioners in the chemical field whereas, until about five years ago, practically no time was spent by either of these groups on utility-disclosure questions. In this new scrutiny of utility to judge its sufficiency, degrees or levels of utility are being distinguished to differentiate what is "practical" from what is not, and applications not meeting a criterion for "practical" utility established by the Patent Office are being rejected.

The rejections are based not only on alleged failure to describe exactly what "practical" or end use a new chemical compound has, but also on lack of disclosure of a specific embodiment of such end use. * * *

In short, the action of the Patent Office in holding that there is no disclosure of utility without disclosure of an end use of the invention, *often in detail unnecessary for those skilled in the art, is seriously impeding the development of the useful arts. This is believed to be contrary to the preeminent purpose of the patent system, which is to promote the progress of the useful arts.* [Emphasis added.]

In their "Conclusion," Cohen and Schwartz state:

Since the *Bremner* decision fostered a too rigorous interpretation of the utility and how-to-use requirements, it was inevitable that an appropriate appellate court would rectify the situation. The *Nelson* decision should reverse the trend initiated by *Bremner*

and tenaciously adhered to by the Patent Office for the last ten years. * * *

The authors further state:

It is believed that the rule of law announced in the *Nelson* opinion is sound. Although the liberal *Nelson* decision might even be termed radical when viewed in the light of Patent Office practice for the past ten years, it finds support in the language of the *Bremner* decision and the Patent Statute.

Mr. Justice Harlan's dissenting opinion in *Manson* correctly reviews the history of the utility requirement in chemical cases and points out the factually insupportable position there apparently taken in the majority dictum. His statement is equally pertinent here. As Mr. Justice Harlan states:

* * * In my view, our awareness in this age of the importance of achieving and publicizing basic research should lead this Court to resolve uncertainties in its favor and uphold the respondent's position in this case.

This position is strengthened, I think, by what appears to have been the practice of the Patent Office during most of this century. While available proof is not conclusive, the commentators seem to be in agreement that until Application of Bremner, 182 F.2d 216, 37 CCPA 1032, in 1950, chemical patent applications were commonly granted although no resulting end use was stated or the statement was in extremely broad terms. Taking this to be true, *Bremner* represented a deviation from established practice which the CCPA has now sought to remedy in part only to find that the Patent Office does not want to return to the beaten track. If usefulness was typically regarded as inherent during a long and prolific period of chemical research and development in this country, surely this is added reason why the Court's result should not be adopted until Congress expressly mandates it, presumably on the basis of empirical data

which this Court does not possess. [Citation omitted.]

I agree with Justice Harlan's views. The position taken here by the majority and the Patent Office in view of the facts of record serves as a warning as to the "path" and direction chemical practice is being forced to take.

### The Majority Here is not Supported by the Facts of Record

Candor requires that the carefully expurgated statement of facts appearing in the majority opinion be enlarged to the end that a fair presentation may be made of all the pertinent facts which bear on the issues before us. Initially, however, the inventions and the basis for the rejection may be summarized in simplified form.[2]

The claims cover what are admittedly novel and unobvious processes (claims 8–12) and products (claims 1–3). The claimed processes and products may be represented in the following diagram by numerals and letters, respectively:

$$A \xrightarrow{1} B \xrightarrow{2} C \xrightarrow{3} D$$

Appellants start with compounds A. Claims 8–12 are drawn to the two-step process 1–2, in which compounds A are converted to compounds B and compounds B are then converted to the products C which are claimed in appealed claims 1–3. Appellants specifically disclose in their specification that products C can be converted to products D by process 3. However, neither products D nor process 3 is claimed and thus they are not in issue here. No question has been raised as to the operability of any of the processes or as to the adequacy of the description and identification of any of the products.

The examiner's answer broadly stated the ground of rejection as to all claims as follows:

* * * It is the Examiner's position that the instant specification fails

to present a disclosure of utility sufficient to *satisfy the requirements of 35 U.S.C. 112.* * * * * [Emphasis added.]

No further statement was made by the examiner concerning the invention defined by *process* claims 8–12. As to the claimed *products* (claims 1–3) the examiner stated:

* * * The fact is not controverted that the applicants have shown a method of converting [process 3] the claimed compounds [C] into another compound [D]; however, it is maintained that the final product [D] has not been shown to possess any specific utility that would be readily apparent to those skilled in the art. It is obvious that most compounds can be converted or modified in some manner; however, such a conversion [process 3] is not deemed to be a basis upon which an applicant may base an assumption of utility and thus *satisfy the requirements of section 112 of the Code.* * * * [Emphasis added.]

No other statute was cited by the examiner. Indulging the presumption that he was aware of the requirements of section 112, the sum of the examiner's position *necessarily* is that the *specification* failed to teach one of ordinary skill in the art *how to use* the *claimed products* and *processes*. Cf. "Requirements of Specifications," In re Nelson, 280 F.2d 172, 181, 47 CCPA 1031, 1044.

The Board of Appeals clearly felt the examiner's sole reliance on section 112 was misplaced. Seizing on the examiner's use of the term "utility", the board sua sponte added to this case a new rejection based specifically on 35 USC 101 in addition to the examiner's stated ground of rejection under 35 USC 112.

When this *new ground of rejection* was brought to the board's attention by appellants' petition for reconsideration, the board's response was:

In the first paragraph on page 3, appellants suggest that we made a new

---

2. A detailed technical discussion at this time would only obscure the issues so it

has been separately written as the "appendix" to this opinion.

ground of rejection in referring to 35 U.S.C. 101, as well as 35 U.S.C. 112. We do not agree that a new rejection is made by referring to the fundamental patent statute which defines patentable subject matter.

I will digress at this point to express my views concerning this failure of due process, inherent in the position of the board, which the majority here condones. The clear intent of 35 U.S.C. § 132 is that appellants be notified *of the ground of rejection* and that they be given an opportunity to be heard *thereon.* See In re Hughes, 345 F.2d 184, 52 CCPA 1355. Here no such notice was provided, nor was any opportunity afforded appellants to be heard on the merits of the fact issue which is central to the board's decision (and which is here made the sole basis for the majority decision).

I simply cannot square such "star chamber" procedures, and the majority's ready acceptance of them, with the basic requirements of the Fifth Amendment. As a matter of *law* the *mandates* of 35 U.S.C. § 132 are not suspended because the board *relied* on (not merely "referred" to) [3] what it terms a "fundamental patent statute." *All* of the statutes are "fundamental" and must be satisfied and to this end the applicant has the right to know, and the Patent Office has the duty to specify, the exact statutory ground(s) of rejection relied on in denying a patent. The examiner did so and formulated the issue as being one of inadequacy of disclosure of how to use under 35 U.S.C. § 112. The action of the board in shifting the issue herein to a rejection under section 101 will be considered further in demonstrating how it directly denied appellants both procedural and property rights without due process.

However, in addition, under what principles does this court purport to operate in granting or denying remands when a new ground of rejection is made? Less than two months ago a majority of this court quoted with approval, in In re Wiechert, 54 CCPA ——, 370 F.2d 927, the following from In re Hughes, supra:

> It seems basic to the concept of procedural due process that an applicant at least be informed of the broad statutory basis for rejecting his claims, so that he may determine what the issues are on which he can or should produce evidence.

In *Wiechert* a majority remanded so that the appellant there could have the *opportunity* to present *facts* as to the unobviousness of the claimed invention because the board sua sponte advanced a totally new theory of obviousness. Here the board forces the appellant to rely on arguments and evidence directed to "how to use" their claimed inventions, section 112. As author of the *Hughes* opinion, I remain of the view that notice and opportunity to be heard are fundamental legal rights which should be zealously guarded and strictly observed.

Returning now to the board's decision concerning the claimed products, it was of the view that:

> * * * such conversion [process 3] does not constitute a disclosure *of utility* [§ 101] for the claimed compounds because there is no disclosed utility nor any indication of a known utility for the 2,3-keto derivative [D]. A *useless* product [C] does not become useful by virtue of conversion into another *useless* product [D]. [Emphasis added.]

As to the process claims, the board's opinion states:

> * * * a process [processes 1–2] which does not result in the production of a useful product [compounds C] cannot be held to satisfy the utility requirement of 35 U.S.C. 101 and 112, no matter how complete the disclosure of how to carry out the process.
> * * *

It is readily apparent that both the examiner and the board were of the opinion that section 112 required appellants

---

3. The board opinion states, "we must sustain the rejection * * * for lack of

disclosure of utility under 35 U.S.C. §§ 101 and 112."

to disclose in their specification how to use compounds D *which are not claimed as their invention.* The board, without factual basis, concluded that as appellants had allegedly not disclosed how to use *these* compounds, ergo, they were "useless."

It is at once apparent that the examiner and the board were not concerned with the *usefulness* of the *claimed* inventions; rather, they were concerned with whether *compounds made from the claimed inventions* were useful and with requiring a disclosure as to how these further compounds may be used.

Any fair and informed reading of sections 101 and 112 is directly contrary to the decision of the majority as well as the reasoning of the board and the examiner. Patentability must be determined on the basis of what is *claimed as the invention.* Here the claims cover both new and unobvious specific chemical products and processes for making them. The tests are whether one of ordinary skill in the art would find the claimed *inventions useful* (section 101) and would be adequately taught by the specification how to *make* and *use* them (section 112).

However, the board opinion, aided by its question—begging, a priori designation of the unclaimed compounds as "useless," must be further examined in light of the Supreme Court's decision in *Manson.* Assuming that the statutes do not require that appellants disclose "uses" for or disclosures of "how to use" *unclaimed* products eventually resulting from their claimed inventions, is there something outside the statutes which requires such a disclosure?

The board said "yes," based on its unsupported assumption and irrelevant observation that one of ordinary skill in the art would know nothing concerning compounds D. Therefore, so reasons the board and the majority here, compounds C and processes 1–2 must be "useless." [4] This, however, does not change the fact that there is not here, nor was there in *Manson,* the slightest *factual* basis for such a characterization of either the claimed products or the claimed processes.

Judge Rich in his *Kirk* dissent demonstrates that chemists of ordinary skill in the art would have no difficulty in using new and unobvious chemical products and processes once they are disclosed as required by section 112. They are "useful," under section 101, as tools, just as other professions have their particular "tools" with which to work. A judge needs no directions for using a new text or a new digest. In appellants' case they have invented or discovered and disclosed a process for the preparation of a product which is described to the steroid chemist as steroids carrying an ester function of an enol on ring A in position 2. Appellants point out that their process is "particularly simple and advantageous because it gives high yields while operating at room temperatures for both steps of the process." The Patent Office ignores this teaching, as does the majority, in reaching the conclusion that appellants' claimed inventions are "useless." Is this action warranted under section 101? I think not.

In this connection, it is interesting to note a recent advertisement of The Eastman Kodak Company which appeared on page 133 of the New Yorker Magazine for March 25, 1967. It describes in part the activities of what are termed "Two executives in charge of eagerness." The advertisement points out that the Eastman line consists of "some 5,000 organic chemicals for laboratory use." The text then continues:

\* \* \* the fewer the starting materials, the more laborious the work. The more compounds that can be purchased from us, the more time our learned customers can put on research instead of preparing for research. \* \* \*

As further pointed out in this advertisement, "Availability governs feasibility for many a research idea in its fetal stages."

---

4. "Useless," having or being of no use. (Webster's Seventh New Collegiate Dictionary).

In just such ways chemical products of the type here involved are "useful" within the meaning of section 101. Eastman Kodak supplies tools in the form of compounds to chemists just as other fields supply tools to chemists in the form of apparatus, e. g., the electron microscope. The patent statutes do not require us to ask what an inventor will do with the results obtained from a new and unobvious form of an electron microscope.

The examiner's position clearly was that the specification failed to meet the requirements of section 112 in not teaching one of ordinary skill in the art *how to use* the claimed process 1–2 and the claimed product C. The board's position in addition was that process 1–2 and product C were "useless," absent disclosure of some "specific" use of the *unclaimed* process 3 and the *unclaimed* product D, hence that appellants' claimed invention was not "useful" under section 101. Thus the board's position is that appellants have not claimed *useful* inventions while the issue as framed by the examiner was whether appellants had adequately taught *how to use* their inventions. These positions raised very different legal problems requiring different factual considerations.

What, indeed, is the meaning of "useful?" We are dealing with a word which we have been admonished in *Manson* is "pregnant with ambiguity." My understanding of the law is that the "useful" inventions encompassed by section 101 are those which are capable of being put to "use," in the sense of doing something with them, of using them, of applying them, of placing them in an active role.

The constitutional provision as interpreted by Mr. Justice Douglas in his concurring opinion in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L. Ed. 162, outlines a test which, if applied to the facts here, requires a reversal of the board's decision. His opinion states:

* * * The invention, to justify a patent, had to serve the ends of science—to push back the frontiers of chemistry, physics, and the like; to make a distinctive contribution to scientific knowledge. * * * Patents serve a higher end—the advancement of science. An invention need not be as startling as an atomic bomb to be patentable. But it has to be of such quality and distinction that masters [persons of ordinary skill] of the scientific field in which it falls will recognize it as an advance. * * * [Citations omitted.]

Justice Douglas' observation, while directed to the old requirement for "invention" which Congress subsequently replaced by the section 103 requirement for nonobviousness is based on the recognition that the patentability of inventions is to be judged by reference to what it contributes to those skilled in the art involved.

I immediately think of the many things I personally do not know how to "use," e. g., the "2-methyl dihydrotestosterone derivatives" in *Manson.* The obvious inquiry is *how* are we to judge what is "useful."

The Supreme Court in the *Manson* dictum advances as one test that judges look to the "objects" of the invention in determining what the invention is useful for. Yet in the same opinion we are told that "objects of scientific inquiry" are, as a matter of law, not "useful." Thus, allegedly because of *Manson,* the majority here and in *Kirk* find that we are dealing with "objects of scientific inquiry" which, under the *Manson* dictum, are not "useful" as a matter of law.

*Manson* also advances as tests that judges look for "'practical," "substantial," and "specific" utility in "currently" available form, thus apparently requiring a search or quest for some quantum of utility which an unidentified segment of society will enjoy in the present, apparently *overlooking the segment which would actually use* the invention or its products.

Mr. Justice Story's test, "beneficial use to society," is rejected in *Manson* as shedding "little light on our subject."

We, as judges, are admonished in *Manson*, "There are, after all, many things in this world which may not be considered 'useful' but which, nevertheless, are totally without a capacity for harm." Apparently new and unobvious inventions lacking some indeterminate quantum and type of utility as vaguely specified in the *Manson* dictum are to fall into this latter category, though no examples are given for our guidance.

However, it is somewhat confusing to consider that under *Manson*, products which inhibit the growth of tumors in laboratory animals are, as a matter of law, considered "useful," i. e., they possess the necessary quantum and type of utility. See in *Manson* footnote 17 listing decisions of this court which are not overruled here by the majority. See also In re Folkers, 344 F.2d 970, 52 CCPA 1269, discussed by Judge Rich in *Kirk*.

What is the basis for drawing such a line of distinction? Wherein lies the "practical," "substantial" and "specific" utility of chemical products which inhibit the growth of tumors in rats and what is the *then* specific benefit to the public in currently available form? At this point in time, such products and rats are in one sense no more than "objects of scientific inquiry," lacking a "specific benefit in currently available form," and as such, under the *Manson* dictum taken broadly are not legally "useful." However, the finding of usefulness of such products was not disturbed by *Manson* or the majority here. Hopefully subsequent experiments will show that these products are similarly useful in humans at a later date. They have a "[potential] beneficial use" to society, see Mr. Justice Story, Gelston v. Hoyt, 3 Wheat 246, 302, 304, 308, 16 U.S. 246, 302, 304, 308, 4 L.Ed. 381 (1818) (Appendix), and as they qualify under *Manson* they are thus legally "useful." It is indeed confusing, in attempting to judge what is "useful," to consider that "beneficial use" to society is insufficient usefulness under *Manson* but that a "potential beneficial use" may be sufficient. Similarly, in judging what is useful, a potential future use to society apparently qualifies as a "specific benefit in currently available form."

In view of the constitutional reference to "science" and the "useful arts" and the *Manson* dictum, how are we as judges to determine what is "useful?" Mr. Justice Story's test stands rejected. Instead of determining whether there is a "beneficial" use to society, are we to determine whether there is a "substantial," "practical," and "specific" use, presumably to society? It does not seem that the substitution of the *Manson* adjectives for Justice Story's adjective "beneficial" provides meaningful assistance in determining when an invention is useful.

Mr. Justice Story, in an attempt to *define* what class of inventions were useful, intimated that inventions which are "frivolous and insignificant," are not "useful" and thus not patentable. But we are warned in *Manson* that this is, in one sense, "a query no easier of application than the one built into the statute." Is it the intent of the *Manson* dictum to define generally and in the abstract those classes of inventions which are to be considered useful, under section 101, and by this definition to exclude all "objects of scientific inquiry?" *Manson* itself does not do so but the majority here leaves us with the unanswered inquiry as to how are we to determine just what is to be considered to be a non-patentable "object of scientific inquiry?" Unfortunately, determining what is an object of scientific inquiry may be more difficult to ascertain than what is frivolous and insignificant.

Does the majority here attempt to construe or interpret *Manson* so as to set forth some meaningful standard or test by which we and the Patent Office may judge what is "useful?" The answer is "No." The majority but repeats the qualifying adjectives of *Manson*, interprets "objects of scientific inquiry" broadly, and concludes that the inventions here claimed are "useless."

While *Manson* does suggest that we, as judges, should look to the nature of the invention and that objects of scientific inquiry *may* not be patentable, I fear for the wisdom of such a test in view of the constitutional purpose of advancing science and the erroneous result reached here by the majority by applying that test. Appellants do not claim an "object of scientific inquiry" in the qualified sense that it was used in *Manson,* if that opinion is given any meaningful interpretation.

Under the majority decision here, and its extension of the dictum in *Manson,* an inventor, contrary to the law as it has existed since 1790, is not entitled to a patent in the chemical field until he can assert and prove that it has a "practical," "substantial" and "specific" usefulness which confers a "specific benefit" which must exist in "currently available form."

It is fortunate indeed that such a view did not prevail in the past. Under such a test I seriously doubt whether the present majority would find the first powered flight of the Wright Brothers to be "useful." Since it lasted but 12 seconds, traversed but 120 feet, and reached a maximum height of but 10 feet, it cannot be said to have had a "practical" or "substantial" utility or that it made powered flight practical or substantial in a then "currently available form." Under the majority view such a flight would indeed be "useless." For that matter, Morse's first attempts at electric telegraphy, Bell's first telephone, Hall's first production of aluminum, Edison's first incandescent lamp and a host of other pioneering inventions did not possess any "practical" or "substantial" utility nor did they yield a specific benefit "in currently available form" until many years after the first primitive tests. By the tests of the majority here all are seemingly "useless" and hence unpatentable. But history shows the usefulness of these inventions was found sufficient for patentability.

The erroneous reasoning of the majority is not new to those who have considered the historical antecedents for the Patent Office position. Rather, such reasoning is to be expected. It may be illustrated, I think, by what has been reliably reported as having been an official action in the application of Marriott, Ser. No 44,822, filed Oct. 31, 1881, for a heavier-than-air device for aerial navigation. Despite supporting affidavits as to operability of the device, the examiner rejected the application for a patent, insisting that "It is the opinion of the examiner that an apparatus for navigating the air which does not depend upon a gas field for the elevating means, is an impractical structure." He suggested an amendment whereby structure defining a closed chamber for a lighter-than-air gas, e. g., a balloon, be added which, in his view, would render the apparatus "practical." Similarly, the test which the majority here writes into 35 U.S.C. § 101 thus requires a personal value judgment as to what is "practical" and hence useful. History shows such a test would be disastrous to the effective operation of our patent system and a most dangerous philosophy.

Before summarily discarding the long-standing interpretation placed on section 101 (on which long-standing and substantial commercial practices have been based), it seems essential to me that inquiry be made into what *chemists* as represented by the *chemical industry* consider to be "useful." With this end in mind, I here take judicial notice of publications of general circulation in the chemical industry and suggest that at least a minimal inquiry should be pursued into *how* that industry determines whether or not a given chemical composition is "useful" and how it "promotes the progress of science and the useful arts." As I measure this in terms of usefulness to the chemical arts and to chemists I do so by considering them to be persons of ordinary skill in these arts and not persons lacking skill. Thus, in the publication Chemical Week for February 4, 1967, as but one example chosen at random, I find on p. 43 the following advertisement of The Lubrizol Corporation

which is typical of many advertisements written for chemists and which may be found in each weekly issue of this magazine.

# A new vinyl monomer to challenge the imagination

## Lubrizol® DAA
### DIACETONE ACRYLAMIDE

LUBRIZOL DAA is a unique, new vinyl monomer for new products and processing techniques.

$$CH_2=CH-\overset{\overset{\displaystyle O}{\|}}{C}-\overset{\overset{\displaystyle H}{|}}{N}-\overset{\overset{\displaystyle CH_2}{|}}{\underset{\underset{\displaystyle CH_3}{|}}{C}}-CH_2-\overset{\overset{\displaystyle O}{\|}}{C}-CH_3$$

**PHYSICAL PROPERTIES:**

The white crystalline reactive monomer has high purity (99.75%), long shelf life and does not yellow.

**POLYMERIZATION:**

LUBRIZOL DAA may be homopolymerized and copolymerized in water or organic solvents using standard polymerization techniques, heat alone, or ultraviolet light. It may also be grafted onto other polymers.

**VERSATILE FEATURES:**

LUBRIZOL DAA provides chemically reactive sites for crosslinking or for chemical modification of polymers. The monomer is soluble in water and most organic solvents. Homopolymers demonstrate excellent ultraviolet resistance. The monomer imparts ultraviolet resistance to certain copolymers. Homopolymers made from LUBRIZOL DAA have high water vapor transmission and gas permeability, properties useful in forming breathable films.

A PRODUCT OF

CHEMICALS

**SUGGESTED APPLICATIONS:**

- To impart unusual surface active properties to adhesives.
- For introducing crosslinking sites.
- In the manufacture of vapor permeable coatings.
- For introducing hydrophilic properties, dyeability and resistance to static charge.
- In textile finishing, paper saturation, and manufacture of breathable paints.

**LIKE TO KNOW MORE?**

The projected price of LUBRIZOL DAA is expected to be in the $.50/lb. range. Samples are available at $1.75/lb. Minimum order: 10 lbs. If you would like to explore the versatility of LUBRIZOL DAA in your laboratory, use this coupon to order 10-lb. samples and to receive complete technical information.

**THE LUBRIZOL CORPORATION – Plastic Chemicals Dept.**
**Cleveland, Ohio 44117**
Please send technical data sheets on LUBRIZOL DAA.
Please ship _____ 10 lb development samples at $17.50 each. Total: $ _____
Purchase Order No. _____
Name _____ Title _____
Company _____
Street Address _____
City _____ State _____ Zip Code _____
CW—2/4

The "new vinyl monomer to challenge the imagination," described in the foregoing advertisement as a new chemical product, possesses the physical properties therein listed. No specific uses are recited for the monomer product but certain "suggested applications" are set forth as follows:

To impart unusual surface active properties to adhesives.

For introducing crosslinking sites.

In the manufacture of vapor permeable coatings.

For introducing hydrophilic properties, dyeability and resistance to static charge.

In textile finishing, paper saturation, and manufacture of breathable paints.

It seems to me that a chemist would have no difficulty in understanding the usefulness of "unusual surface active properties" or visualizing the compound as a tool to introduce "crosslinking sites." Thus I would find that the compound offers a specific benefit in currently available form and is useful in view of any meaningful interpretation given to *Manson*. I doubt if any of these "suggested uses" would be legally "useful" in the view here expounded by the majority.

In the same issue of the same magazine on p. 8 the following advertisement of TAM Division of National Lead Company appeared:

# Have you ever explored the amazing versatile properties of TAM Zirconium compounds?

**Looking to improve your company's products or processes?** Then your Research and Development Department will want to examine the superior properties of zirconium compounds. Technology has hardly scratched the surface of zirconium's range of applications.

### for example...ZIRCONIUM

- Hooks fatty acids to textiles, making them water-resistant.
- Cross-links polymers with amazingly powerful bonds.
- Binds dyes together to form pigments for paints.
- Ties up odors. Example: eliminates malodorous components of perspiration.
- Sequesters irritants. Example: makes innocuous the irritating components of poison ivy.

### likewise...ZIRCONIUM

| helps bond | insolubilizes | and also |
|---|---|---|
| metal to metal | latex films | tans hides |
| metal to oxide | starch adhesives | toughens films |
| oxide to plastic | polyvinyl alcohol | sequesters |
| preservatives to textiles | proteins | detergents |

**Plus a broad range of other applications.**

Your company library should have a copy of the study, "Zirconium Chemistry in Modern Technology." This paper plus Product Data Sheets are available upon request. Write in full confidence. Address:

*Executive and Sales Offices:*
TAM Division, National Lead Company
111 Broadway, New York, N.Y. 10006
*In Canada:* Enelchem Products
Division of Canadian Titanium Pigments, Ltd. ·
1401 McGill College Avenue, Montreal 2, Quebec

ZIRCONIUM CHEMICALS
**National Lead**
TAM Division

I note it asks the question:

Have you ever explored the amazing versatile properties of TAM Zirconium compounds?

The advertisement continues with examples of some of the properties of these Zirconium compounds as follows:

Hooks fatty acids to textiles, making them water-resistant.

Cross-links polymers with amazingly powerful bonds.

Binds dyes together to form pigments for paints.

Ties up odors. Example: eliminates malodorous components of perspiration.

Sequesters irritants. Example: makes innocuous the irritating components of poison ivy.

The chemist is told he can hook a fatty acid, cross-link a polymer, bind a dye, tie up an odor or sequester an irritant. The usefulness of such a versatile tool would surely be understood by a chemist. The chemist who *uses* this tool may be concerned with the usefulness of his end product or have some objective in mind but the inventor of the tool should not have to be concerned with these considerations. The majority here, however, says he must. Further, are any of these suggestions the disclosure of a legally "useful" product within the rule here applied by the majority?

Another consideration which demands a careful evaluation of the majority's view here arises from the currently vast expenditures of public funds in support of research. The public press almost daily contains reports of such research programs. The following report was taken from the Washington Post, February 15, 1965.

# *Molecule Built As Virus Fighter*

National Science Foundation drawings
This is the familiar benzene ring, made up of hydrogen and carbon atoms.

This is cubane, a box-like chemical structure recently synthesized in the laboratory.

A radical new chemical molecule with *potential* as an anti-viral drug, a pesticide, and *who knows what else,* has been put together atom by atom by a 28-year-old University of Chicago chemist.

The new molecule is called cubane to describe its box-like structure. As far as chemists know, cubane does not exist in nature.

A description of cubane, *long sought after by chemists,* was given yesterday in the annual report of the *National Science Foundation, which financially supported its development* by theoretical chemist Phillip E. Eaton.

Cubane is a hydrocarbon, a member of that vast family of hydrogen and carbon molecules such as propane, benzene and naphthalene that play an important role in science and industry. But what distinguished cubane from all other known hydrocarbons is its unique-geometry. Essentially, cubane has a box-like or cage structure with a hole or cavity for a center.

*Derivatives Sought*

Eaton, who is interested primarily in the theoretical aspects of his new molecule, explained yesterday that *he now is tinkering with the molecule to produce cubane derivatives.* This means substituting certain atoms such as iodine and bromine for hydrogen atoms or groups of atoms such as amines for hydrogen atoms.

Ever since its creation last year, which took Eaton nine months, *cubane has been eagerly sought by theoretical and practical chemists alike. So much so, Eaton suggested, that he is having difficulty meeting the demand.*

Because cubane bears certain relationships to other molecules with biological significance, *at least two chemical companies want to test cubane compounds as anti-viral drugs. Other researchers think cubane-derivatives have promise as pesticides. But Eaton said it is still too early to predict what specific application cubane compounds will have.*

*President Urges Support*

The synthesis of cubane, which has *attracted worldwide attention,* is one of several *Government-sponsored research achievements cited by the Foundation in its annual report to the Congress.*

Yesterday, in a message accompanying the report, President Johnson *encouraged Congress to maintain its "support of what is required to assure America's continuing leadership in the science and technology of our times."*

At the same time, the report served to acquaint Congressmen with the views of Leland J. Haworth, who a year ago became director of the Foundation, which is the Federal patron saint of scientific research and education.

In a lengthy statement, Haworth set forth some of his ideas for meeting challenges that face Government support of science in general and the Foundation in particular. Hence, Haworth noted that the Foundation "is actively seeking" *new administrative devices to provide researchers with longer-term support than has hitherto been possible.*

*Centers of Excellence*

Haworth also suggested that the phrase "centers of excellence" be more precisely defined to mean not just an entire institution, but a department or school within an institution.

And finally, with a nod to the increasing interaction of science and politics, Haworth said:

"It is clear that determination of appropriate levels of support by fields of science is a problem that will continue to *require judgments which take into account policies, attitudes, and political realities—none of which can be treated quantitatively.* These may, in a good many cases, turn out to be the most important elements in setting priorities." For the immediate future, therefore, Haworth concluded, the Foundation has no choice but to con-

sider these elements in making its decisions. [Emphasis added.]

As I understand the thrust of the majority opinion as it interprets the *Manson* dictum, new chemical products such as those envisioned in the above article are not legally "useful" and hence not patentable. Thus the Federal Government which has financed the development of such products through the National Science Foundation may not be protected for the molecule disclosed has no "presently available," "substantial" use, hence in the legal sense is "useless" and thus does not meet the requirements of 35 U.S.C. § 101 as here interpreted by the majority. Yet, I assume that one who appropriates this research and applies it to a child's crayon or a roach killer may secure a patent because killing roaches or enabling a child to draw a picture is a "presently available," "substantial" use. Thus, the fruits of publicly financed research and the public's rights therein will be subordinated to patent rights which I presume the majority here would recognize might be properly granted to the roach killer or crayon manufacturer for such a "presently available," "substantial" use of the publicly financed "cubane." The impact of the majority view here and in *Kirk* is that unless and until the invention meets the use tests, as the majority interprets the *Manson* dictum, no patent may be granted on it. I submit such a result would be avoided, and a much more equitable solution of this pressing problem would have been possible under the view we expressed in In re Isaacs, 347 F.2d 887, 52 CCPA 1791.

The substance of the above article should be of great concern to all interested in a sound patent system. Mr. Eaton gave something to science which was long sought after. He is having difficulty in meeting the demand. His discovery has attracted the attention of the President, Congress and the world. Only suggested uses are known. But President Johnson * * * encouraged Congress to maintain its "support of what is required to assure America's continuing leadership in the science and technology of our times."

It seems to me that the majority does a great disservice, which will have untold repercussions, by misapplying and misconstruing *Manson*. What purpose is served by placing the Supreme Court in conflict with both the reality of research and national goals by elevating dictum and portraying the Supreme Court in a ridiculous posture through misconstruction?

It may be that Mr. Eaton's discovery "may engross a vast, unknown, and perhaps unknowable area," *Manson*. However, this is the case in all major breakthroughs. And the possible uses of an invention should not be confused with the invention.

I fear for the inventor and science in general in view of the majority opinion. Unless *Manson* is reconsidered or further clarified by the Supreme Court, or unless Congress takes note, Mr. Eaton and his colleagues, as well as this country, will suffer a devastating loss.

For some 177 years the broad dissemination of knowledge was encouraged by the Constitution, the patent laws, and uniform judicial decisions which placed a liberal interpretation on the term "useful" as it now appears in section 101 and as it has identically appeared in its predecessor statutes. Under it, an inventor could patent any new and unobvious chemical product so long as it was not "frivolous or detrimental to public morals," which meant, practically, any such product. Thus the minimal requirement stated in *Bremner* was the rationale under which patents on new chemical products were issued. Once the patent application was filed, under such law the inventor and his assignee did not lose their legal rights in the invention by introducing the products to the consuming industries, as the above advertisements indicate, and by telling potential consumers all of the then known properties of the products in order to broaden the market for their products. As I view it, this is precisely what the constitutional provision was intended to accomplish.

But now, after the majority decisions in *Kirk* and the present case, I seriously question whether this type of commercial exploitation of new chemical products can be safely indulged in by the industry. Certainly a mere recital of physical properties and the *suggestion* of possible uses does not meet the meaning ascribed by the majority or the Patent Office to the term "useful." It becomes, instead, but an open confession of what the majority characterizes as a "useless" product. The inevitable result is bound to be a greater resort to secrecy and delayed disclosure of scientific information.

Appellants have disclosed a simple and advantageous process of placing a chemical substituent on a steroid and the majority asks, erroneously in my view, what do you do with the resulting compound, etc.? Considering the TAM Zirconium compounds, supra, the majority would apparently label them as "useless" until someone explained what you did with the compound after you hooked a fatty acid, etc.

Before rendering opinions having the sweep and scope of the majority opinions here and in *Kirk,* we should first look to those of ordinary skill in the art to which the invention pertains and judge its "usefulness" on this basis. Otherwise, the result will be that envisioned by Mr. Justice Harlan in his dissenting opinion in *Manson* where he stated:

* * * The thought that these inventions may be more likely than most to be disclosed even if patents are not allowed may have more force; but while empirical study of the industry might reveal that chemical researchers would behave in this fashion, the abstractly logical choice for them seems to me to maintain secrecy until a product use can be discovered. * *

What I find most troubling about the result reached by the Court is the impact it may have on chemical research. Chemistry is a highly interrelated field and a tangible benefit for society may be the outcome of a number of different discoveries, one discovery building upon the next. To encourage one chemist or research facility to invent and disseminate new processes and products may be vital to progress, although the product or process be without "utility" as the Court defines the term, because that discovery permits someone else to take a further but perhaps less difficult step leading to a commercially useful item.

The facts recently before us in Huang v. Cheney, 362 F.2d 816, 53 CCPA 1355, provide some needed perspective on the public policy aspects of the problem created by the majority opinions here and in *Kirk*. This was an interference and no issue of patentability was before us. There one Bachelor published a paper disclosing how to obtain, by a process of microbial fermentation, a supply of 6–APA, 6–Aminopenicillanic acid. Applying the *Manson* dictum, as interpreted by the majority, to Bachelor's invention requires the conclusion that since 6–APA per se at this stage had no "practical," "substantial" utility, ergo it was "useless," his new process also was "useless." However, since it was apparent to both Huang and Cheney that 6–APA was a product which might lead to interesting new penicillins, they were immediately spurred into action when they knew of its existence and they began their experiments for modifying 6–APA. Starting with the 6–APA product, both Huang and Cheney subsequently invented in a few months the same "end" product which was shown to have therapeutic properties. The contest in this court was to determine which party was the first inventor of the end product. It is clear that *but for Bachelor, there would have been no Huang or Cheney invention.* It is my view that Bachelor's process and product had utility and that this was of a "practical" and "substantial" nature in the chemical arts for it provided a source of materials from which to develop other products not then known. Those in the penicillin art had no difficulty in understanding Bachelor's suggestion.

In this case and in *Kirk,* we see the deleterious effect of the dictum in the

*Manson* majority opinion as applied by the majority. The effect is that judges, not persons of ordinary skill in the pertinent art, are the arbitrators of what is and what is not "useful." Such an important decision should not be subjectively based on the personal experience, education and background of individual judges. It should be based upon the empirical standard stated generally in the patent statute as historically construed. This statute recurringly rests on but one standard, and that standard is the *knowledge* possessed *by one of ordinary skill in the art* to which the invention pertains. Thus, under section 103, inventions are to be considered according to their subject matter and the pertinent prior art, and are to be judged as to their nonobviousness by reference to the knowledge and skills of one of ordinary skill in that art. Also, whether an invention is effectively communicated to the relevant public under section 112 by a given specification is determined again by reference to the empirical standard of what is known by a person of ordinary skill in the art. It is inherent in the statute that "usefulness" should be judged also by whether the invention is *useful to one of ordinary skill in the pertinent art*, not by the subjective judgment of an *examiner* or a *judge.*

An indication of use is not necessary *in every case* in view of section 101 and *Bremner.* Where usefulness is apparent to one of ordinary skill in the art to which the subject matter sought to be patented pertains, section 101 is satisfied. Thus new and unobvious sprockets, gears, or transistors, etc., are patentable without disclosure *in extenso* as to their possible end uses. We, as judges, need not know how to use (section 112) a new and unobvious transistor; nor should we be concerned with examining the specification to find an allegation that the transistor is a useful manufacture. Considering a transistor, we act, in effect, on our past mental conditioning for we *know* that to persons of ordinary skill in the art transistors are useful. Thus, in approaching the task of judging this is-

sue, we act on this acquired knowledge, not our *subjective impulses,* that transistors are useful to those persons who are skilled in the uses for and application of transistors.

Many inventions, however, do not touch us so intimately in our daily lives as the transistor. Recently we considered a "non-linear code member." In re Jones, 373 F.2d 1007, 54 CCPA ——. The Patent Office did not question, nor did we, the "usefulness" of that invention. Had the Patent Office done so, however, how would we have approached the task of deciding that issue? If we should assume that we personally did not have knowledge of its "usefulness," we would obviously be dependent upon others being able to *communicate* to us that the invention was useful. According to the specification in *Jones,* his invention was "useful" to those of ordinary skill in the pertinent art because a "half-quantum error" could be introduced in the distribution patterns upon the code member and thereafter corrected in the computer read-out equipment. While one of ordinary skill in the art could "see" the usefulness of this invention at once, will those not possessing those skills reach the same conclusion? This to me constitutes the grave error of the test here adopted by the majority for if the inventor cannot *communicate* to a judge that his invention is "useful" *so that the judge understands this fact* he will lose rights in what is in fact a "useful" invention to those of ordinary skill in the art. Why should the inventor's compensation for a full disclosure of his invention be dependent on the ability of an examiner or a judge to see the "usefulness" of the invention? The inventor should not have to in effect build a bridge from the judge's personal knowledge to his invention so that the judge then understands the "usefulness" of the invention.

It seems to me the issue can be properly and more simply resolved by *proof of the fact* that persons of ordinary skill in the art *know how to and can use or are using the invention.* Patent examiners and judges are qualified to

rule on the sufficiency of such proofs. Any other basis for determining usefulness is very dangerous indeed. If persons of ordinary skill in the art are in, *fact* using the invention, the inquiry as to usefulness should be at an end. Why complicate the inquiry with a requirement of proof as to some personal values and knowledge of those who must determine usefulness?

Thus, I am in basic disagreement with the premise underlying the majority opinions here and in *Kirk*. It leads to the wholly insupportable conclusion that objects of use to scientists in scientific research are not "useful" even though many scientists may in fact be using them to "promote the progress of science." The fallacy in the majority's reasoning thus lies in its requirement that one who does not possess the knowledge or skills of one of ordinary skill in the art, must "see" and "understand" an asserted use for the disclosed invention before the requirements of section 101 are met. In the present case steroid chemists may in fact have many uses for the claimed product and process for its manufacture. Thus, it seems to me the determination of the usefulnes of a chemical product and a chemical process for making it should and must be determined by reference to the knowledge and skills of chemists as those of ordinary skill in the art. It leads to perversion of the statute to substitute for such skilled persons those who may be lacking in those precise, often specialized, skills and the knowledge and perception necessary either to understand or to appreciate the disclosed usefulness of the claimed invention.

I do not believe that *Manson* holds otherwise. To construe that decision out of context, as does the majority, results in its being here applied contrary to the constitutional purpose underlying section 101.

### *The Board Erred in its Ruling on the Only Issue Before It*

Turning to the instant case, the issue arising under section 112 is clearly before us. The issue under section 101 is not. As to the issue under section 112, failure to disclose how to use the invention, I think it clear that the disclosure of the steps of the process for producing the esters C, being described by appellants in such detail that one of skill in the art could duplicate the steps of the process and obtain the compounds, is an adequate disclosure of how to use the process under 35 U.S.C. § 112. I think the board recognized this, judging from the tenor of its opinion which clearly shifted the rejection to one couched in terms of section 101. A steroid chemist of ordinary skill in this art would know how to use the products C as intermediates in further syntheses. The law as it existed prior to this case and *Kirk* does not require that the specification disclose how to use the resultant products and so on with each step in its turn, ad infinitum, until some "practical substantial useful" end product is reached. It is a wholly impractical test. Under it one conceivably could not patent a pigment until it had been dispersed in a vehicle to form a coating composition which in turn had been shown to have utility as a paint *and this in turn would not be acceptable until it had protected a surface for some indeterminate number of years* which could be made to vary at the whim of either the examiner, the board, or this court. To state the test in these terms is but to demonstrate its impracticability.

In this regard, I think it significant that the board here recognized that the skill of the art was such that the conversion of a chemical product from an ester to a keto product was obvious. It stated:

* * * Appellants claim compounds having an ester group on the 2–carbon. A recognized property of an ester is that it can be hydrolyzed to the corresponding alcohol. This is what appellants accomplish by their acid hydrolysis. The resulting alcohol is the enol form of the well-known keto-enol tautomerism, as will be seen by reference to standard chemical encyclopedias and dictionaries and text

books of organic chemistry, and a shift to the keto form occurs. Accordingly, it may properly be said that the claimed esters have the customary property of being convertible to the corresponding alcohols which, by virtue of their enol form, exhibit the property of converting into the tautomeric keto form.

In many cases how to use a chemical product can be determined from a consideration of its chemical structure. In the final analysis, utility of a chemical product necessarily lies in the employment of one or more of its properties. In re Folkers, 344 F.2d 970, 52 CCPA 1269. In fact, properties of a chemical product are often best described in terms of its uses, e. g., its properties as an adhesive, oxidizing agent, plasticizer, solvent, etc. Thus, is seems to me the how to use requirement of section 112 was clearly satisfied.

The present record is such that the decision in *Manson* is clearly not applicable to the section 112 rejection made by the examiner and nominally affirmed by the board. I would, therefore, reverse this ground of rejection as to all appealed claims.

*The Section 101 Issue and the Misconstruction and Misapplication of Manson*

It is my view that *Manson* is not controlling of the result on the section 101 issue, assuming this issue is before us. In its broadest application *Manson* definitely is restricted to a section 101 utility issue as it arose in the context of the right to an interference with an issued patent. The specific factual context in *Manson* presented this issue as turning on the sufficiency of affidavits to show

prima facie priority under Patent Office Rule 204(b). In *Manson* reliance was placed on an affidavit assertion that *utility was obvious to the applicant.* There was *no* disclosure of *any use of the product* there claimed.

The present specification, in contrast, contains a specific disclosure of use of the claimed products C as reactants in a process of making the products D. Appellants state that the steroid products "are known to be useful in the formation of A-nor compounds." This assertion stands unchallenged by the examiner.[5] Here, the specification teaches that:

The products obtained by the invention, the lower organic carboxylic acid esters of enols in the 2–position of $\Delta^1$–steroids, *are particularly useful as intermediates in the preparation of steroids, especially steroids having a ketone* group in the 2–position, such as 21 – acetoxy – pregnane – 17α–ol–2,3,–11,20–tetraone and [21–acetoxy] 16α–methyl – pregnane – 17α – ol–2,3,11,–20–tetraone by acid hydrolysis and customary separation steps. [Emphasis added]

Thus, not only does the present *specification identify the materials* to be used in the reaction but *it further specifies the conversion processes* as by "hydrolysis and customary separation steps."[6]

It is my view that the section 101 utility requirement for the process is clearly satisfied here, considering the nature of the process invention, i. e., the fifth alternative way disclosed by appellants to put an ester of an enol on the 2–position of steroids, particularly of the $\Delta^1$ –pregnane series, *which alternative process is asserted to be simpler and to give higher yields than prior known processes.*

5. The examiner's letter of April 18, 1962, and his answer on appeal made no objection to that assertion. The board made the first objection to it. Appellants assert that the board's objection was in error and raise this issue in their reasons of appeal.

6. Such steps are disclosed in the specification after both examples I and II in which the steroid chemist is told how to hydrolyze the produced by the examples,
"with strong mineral acids such as hydrochloric or sulfuric acid at ordinary temperatures and isolation of the product by dilution with water, precipitation and recrystallization in an appropriate solvent."

Likewise, and independently, the claimed product has been shown to be useful as a starting material in a chemical process for making the 2,3–diketo compounds. This seems to me to meet all the requirements for establishing a section 101 utility. I would therefore reverse the rejection of both the product and process claims as being based on an insufficient assertion of section 101 utility.

### The Insupportable Rationale of the Majority Opinion

The final paragraph of the majority opinion reads:

> We conclude that appellants have not discharged their burden to show that the claimed subject matter is "useful" within the requirements of section 101.

I do not agree either 1) that the examiner ever placed appellants under such a burden or 2) assuming they had this burden, that they failed to discharge it.

Appellants were asked to submit a memorandum on reargument. As to the claimed compounds, appellants state:

> Pages 12 to 15 of appellant's brief point out how, by known methods, the compounds claimed herein can be converted into compounds of recognized utility, namely, A–nor–cortisone and its 16α methyl derivative. The Solicitor has not denied the factual correctness of this argument, but has merely urged that it should not be considered because it was not presented to the Patent Office. But this is not correct, *for in* the amendment of April 6, 1962 * * * *it was argued that* "one skilled in the art would know that the 2, 3, 11, 20–tetra–ones made from the claimed intermediates could be used to form the corresponding a–nor steroids."

That is exactly the argument being made here, with some expansion by reference to standard text material, and to a patent showing actual utility for the product referred to (this patent having a filing date well ahead of appellants' date). *Appellants felt justified in assuming that the Examiner would be familiar with the reactions shown to be recognized by Fieser and Fieser* [a standard textbook], *and did not feel it necessary to amplify the argument when it was originally presented.* [Emphasis added.]

The majority dismisses appellants' evidence without consideration. Here I believe the majority errs for this evidence proves what appellants have argued throughout the prosecution: that one of ordinary skill in the art, i. e., a steroid chemist, would know that the claimed products were useful products for the production of products D *and* that they would know that products D were also useful products. The facts of record, simply stated, show that the board *erred* in *its* evaluation of what one of ordinary skill in this art should be presumed to know about the uses of the products C and D. It seems to me, therefore, that the board first raised an issue of *fact* by its challenge as to what a steroid chemist would know about the usefulness of the claimed products and processes. It then denied appellants any opportunity to refute its conclusions. This action of the board in thus making a new ground of rejection and refusing to label it as such was clearly prejudicial to appellants and this error is compounded by the majority.

### The Board and the Majority Predicate their Conclusions on a Baseless Fact Issue

The record in this case will be searched in vain for *any support whatsoever* for the underlying *factual* assumption of the board that we are here concerned with a "useless" product or with its conversion into another "useless" product.

Here, as in the dissenting opinion in our decision in In re Manson, the unsupported designation of the product as "useless" raises a *false* fact issue of admittedly highly emotional appeal. The fact is that there is not here, nor was there in *Manson, the slightest factual basis for such a characterization of either the product or the process!*

The majority decision here, as well as in *Kirk*, proceeds to its conclusion by an unquestioning *assumption* that we are concerned with "useless" chemical products. This concept carries over and pervades its decision here not only as to the product claims but also as to the process claims directed to the making of these products. Such unwarranted *fact* assumptions at the appellate levels suggests that policywise, Congress should enact into law the solution suggested by Judge Rich in *Kirk*, supra, the rule which prevailed prior to the misapplication of the *Bremner* decision after 1950, i. e., that all chemical compounds are useful per se within the meaning of 35 U.S.C. § 101. Chemists know how they can use chemical compounds, and particularly so here when they are told about their chemical structures and specific processes are disclosed for their use. They are, in fact, the "tools" of chemical research and development. Are they inherently less "useful" than are the other tools of research?

*The Patent Statute Applies Equally to All Inventors Without Regard to the Technical Fields to Which Their Inventions Relate*

The view of the majority here that inventions in the chemical field require a standard of utility different from that in other technical areas, raises a very serious problem under the patent statute enacted pursuant to the power granted in Art. I, Sec. 8, Clause 8, of the Constitution. In the present context, the constitutional grant of authority to Congress encompasses all "inventors." No distinction is made in the statute between "inventors" of different classes of invention. 35 U.S.C. §§ 101 and 112 do not distinguish between classes of inventors or the subject matter of their inventions. The board and the majority here do not so apply the requirements of sections 101 and 112. By misconstruing the *Manson* dictum, as is done by the majority here and in *Kirk*, inventors in the chemical field are improperly set apart from all inventors as a class and are

burdened with special class requirements which are not sanctioned by the Constitution nor required by the statute. The result is that inventors concerned with inventions in the chemical field are effectively segregated from the broad class of "inventors" and thus denied the equal protection of the laws enacted by Congress. No rational basis has been advanced by the board or the majority for their segregation of chemical inventors and requiring from them more of a disclosure of utility for a chemical "tool," than what they require from inventors in the other technical areas. The issue is, how far can the inventor of a chemical "tool" be legally required to go beyond the requirements of the statute in disclosing utility of his invention? The clear intent of the statute enacted under the constitutional grant is *that there is to be no distinction between classes of inventors*.

*The Attitude of the Board of Appeals Toward Judicial Review Is Insupportable*

Another aspect of the present case requires comment. The Board of Appeals in its opinion, after reviewing certain decisions of this court and of the Court of Appeals, D. C., found a conflict between the views of the courts and stated:

Faced with a conflict in the holdings of the two tribunals which review our decisions, we must determine which line of decisions to follow. We cannot lay down any general rule. We must be governed by our own best judgement and follow those decisions which, in our opinion, best define the spirit and the letter of the law until a higher tribunal or a specific statutory enactment resolves the conflict.[1]

1. We realize that, in the past, when decisions of the Court of Customs and Patent Appeals and of the Court of Appeals for the District of Columbia were in conflict, we followed the decisions of the former court (Ex parte Graham, 49 USPQ 34; Ex parte Hastings, 88 USPQ 431), but we find no sound basis for adopting this as an inflexible rule.

This statement shows on its face that it is based on a false premise. The Court of Appeals, D. C., does not *review* the decisions of the Board of Appeals. Its jurisdiction with respect to ex parte Patent Office rejections is limited to *reviewing decisions of the District Court, D. C.*, on proceedings arising under 35 U.S.C. § 145 *which are trials de novo*. The action of the District Court, D. C., under 35 U.S.C. § 145, and the action of the Court of Appeals, D. C. thereon, do not in any legal sense constitute an *appellate review* of *decisions* of the Board of Appeals.

However, the board by some logic, not apparent to me, not only ignores the decisions of this court but also fails to consider or apply the law of utility as enunciated by the Court of Appeals, D. C., in Canadian-American Pharmaceutical Co. v. Coe, 75 U.S.App.D.C. 313, 126 F.2d 847, (1942), followed in Ex parte Brahn, 65 USPQ 282 (P.O.Bd.App. 1945). In the former case the Patent Office tribunals had rejected an application for a patent on "Ensol," a medicine for reducing the pain of cancer, and on a process for its manufacture. The position of the board was that since "Ensol" had not been shown to check tumor growth, it was not "useful," hence not patentable. The District Court agreed with the Patent Office that the disclosures lacked utility. The Patent Office and the District Court apparently proceeded on the concept, as would the majority here, that unless there was a "practical" and "substantial" utility of *curing* cancer, the drug was "useless." The District Court's decision was reversed on appeal. Judge Edgerton's opinion concludes with the following statement, 126 F.2d at 848:

> It may be that some medical scientists would discourage the use of Ensol pending further tests. It is not within our function to decide, and we do not assume to decide, whether its use should be encouraged or discouraged. But we do have to decide whether *under the evidence in the record in this case it has been clearly shown to*

*have utility within the meaning of the patent law*. And *the evidence seems to us to make it clear that Ensol does*, in many cases, *reduce the pain of cancer*, and that it *causes no serious harm. There is no finding, and no evidence, to the contrary*. It follows that Ensol has an "important function" and "works." In our opinion, the District Court's finding that the invention is *not sufficiently* reliable, *useful* and important to warrant the grant of a patent is incorrect. [Emphasis added.]

Thus, the only "policy" which seems to have governed the Board of Appeals here is that which ignores all decisions, either of this court or of the Court of Appeals, D. C., which may be in conflict with its "own best judgment." Such a capricious rule substitutes the whims and notions of the individual members of the Board of Appeals for the decisional law of the courts which Congress has duly authorized to decide such matters. The majority passes this arrogation of authority without comment!

*Conclusion*

It is but a sign of human frailty to fear that which we do not understand. The first automobiles were but "Rich Men's Toys," allegedly devoid of practical application which, it was thought, would never replace the horse, until innovative pioneers in this field taught mankind to understand and appreciate them. They were indeed "useless" to the farmer whose horses, terrified by them, ran away, damaged property and took lives. Basically, all progress is predicated on the ultimate acceptance of new ideas which at their inception, were understood only by a few who possessed the special education and skills necessary to understand the idea, and were "useless" to the vast majority of people.

Here, and in *Kirk*, the majority opinions seem to proceed from some lack of appreciation of the new and unobvious inventions here in issue. Had their disclosure been couched in the language descriptive of a scientific educational

"toy" or a teaching device, for example, I doubt that either the board or the majority would have characterized it as "useless." I believe this would have led to the opposite conclusion for, so considered, both the instant process and the products would have practical application in presently available form and hence be "useful" within the meaning of 35 U.S.C. § 101. Yet, the inventions would have been the same.

Candor and completeness of disclosure in patent applications must be encouraged if the patent system is to serve its constitutional purpose. The decisions here and in *Kirk*, extending as they do the dictum in *Manson*, place a premium on subterfuge. One may imagine numerous allegations of use for the present products and process which, I suspect, would be accepted by the majority.

However, because appellants spoke to steroid chemists in a language which they mutually understood and discussed the utility of their process and products in these terms, the board and the majority have here penalized them. I do not question but that a producer of chemical products for sale to research workers could well practice appellants' process and produce the products C. The very *fact* that such products can be thus made available permits the researcher in the challenging areas of steroid chemistry to devote more of his time to that research instead of being required to first invent the chemical products necessary for his investigation.

The history of technological and scientific progress is full of examples in which availability of a particular material governs the decision as "to feasibility for many of a research idea in its early fetal stages," see the KODAK Company advertisement, supra. Without the earlier development and availability of heat-resistant refractory metals for its blades, a jet engine is impractical. Without products developed from special rare earth metals, color television is similarly impractical. Without the basic tools and materials of research, progress is retarded. It is precisely in this area in which I see the greatest dangers flowing from the fallacies upon which the majority opinion is based.

Without patent protection on their new steroid products and the processes for manufacturing them, how can appellants afford to disclose these products and make them available to other research workers in the steroid field? Unless it is made economically feasible for them to do so, how can we assure the continued flow of just such research tools to the scientific community? The inventors of chemical tools should neither be *discriminated* against nor *confused* with those who devise ways and purposes to apply those tools.

These policy considerations seem to me to outweigh in public importance the alleged unsupported dangers recited in the *Manson* dictum. The policy considerations in *Manson* were far different from those which are here postulated. The *issues* before the court in *Manson* necessarily involved the policy of issuing the patent to the first inventor and discouraging unnecessary interferences. On this issue *Manson* can be said to be in harmony with sound public policy.

Here, however, since there is no such issue, we should, it seems to me, balance the encouragement of early filing of *candid* disclosures against the ambiguity as to what is meant by "useful" in 35 U.S.C. § 101. Within the context of the useful chemical arts of today, a new and unobvious chemical product is "useful." So is the process for manufacturing it. The encouragement of early filing of patent applications on such inventions should be the overriding policy and nothing should be done to dilute the effectiveness of the statutory requirements of 35 U.S. C. §§ 101 and 112. The majority opinions here and in *Kirk* are but open invitations to applicants for patents, in order to secure an early filing date, to include assertions of utility which will be understood by the laymen without necessarily advising the research scientist of the real purposes for and uses of the disclosed invention. Just how "useful" is the disclosure of a chemical

product as a roach killer costing many dollars a gram to a researcher who needs this product as a research tool, which is not disclosed, in the field of medicine, food production, and other areas of research investigation and study possessing an admittedly highly emotional appeal? Yet, I judge an assertion of utility of such a product as a roach killer would be a sufficient compliance with section 101 as to pass the board, and the majority requirements as here stated.

The majority's affirmance of the board proceeds from its adoption of the Board of Appeals' characterization of appellants' claimed products and processes as "useless." The board's conclusion is based on its unsupported assumption of fact which the majority does not question. No opportunity was afforded appellants to meet this issue. Thus, they have been denied a potentially valuable property right without due process.

The board's opinion evidences its preoccupation with the game of "cat's cradle."[7] The board opinion states:

* * * The operations involved in that game may be described in perfect detail but, aside from the entertainment or amusement aspects of the game, the process cannot be said to be useful. Similarly, the method here claimed may be an interesting exercise in chemical processing, but this does not mean that the process is useful, absent the production of a useful end product.

In its opinion we are introduced to what the board terms a "chemical version of cat's cradle." Were it not for the tragic end of this story, such an allusion might well be passed as a bit of imaginative and even entertaining writing. Here, however, the "endless string" with which the board played out its own little game

in not complying with 35 U.S.C. § 132 is fashioned by the majority into a noose with which appellants have been hanged without having had their day in court. This tragedy is further compounded for, along with appellants, the majority have hanged 1) the rights of all parties to due notice and a fair hearing in Patent Office proceedings, and 2) appellants' constitutional right to due process and the equal protection of the law afforded by the patent statute enacted pursuant to Art. I, Sec. 8, Clause 8, of the Constitution.

The injustice done appellants cries out to be remedied.

### APPENDIX

Appellants' invention relates to esters of steroids of the $\Delta^1$-pregnene series and to a process for their preparation. More particularly, appellants disclose members of the $\Delta^1$-pregnene series having lower organic carboxylic esters of enols in the 2-position thereof, which may also have a methyl group in the 16-position. Claim 1, generic to the disclosed class of compounds, is reproduced here with appropriate numbering of the various positions added:

1. A compound having the formula

wherein X is selected from the group consisting of hydrogen and methyl, Y is selected from the group consisting of hydrogen and an acyloxy radical of a

7. Cat's cradle. A game played, esp. by children, with a string looped on the fingers so as to resemble a small cradle.

Cat's Cradle, first figure.

lower organic carboxylic acid having 1 to 7 carbon atoms and Y′ is an acyl radical of a lower organic carboxylic acid having 1 to 7 carbon atoms.

Claims 2 and 3 are specific to 2,21-diacetoxy - Δ¹ - pregnene - 17α- ol-3,11,-20-trione and 2-acetoxy-16α-methyl- Δ¹-pregnene-17α-ol-3,11,20-trione, respectively. Since the steroid has an =O group at each of the 3,11 and 20-positions it is called a trione. The nomenclature "Δ¹" has reference to the double bond between the 1- and 2-position carbon atoms. The ester group produced by the process is the Y′O-group at the 2-position. The positions 1–4 are all contained in the so-called "A" ring, of the four-ringed steroid nucleus.

Regarding the process for producing the esters, appellants first note that four prior art processes for producing an ester function or group at the 2-position in the A ring of steroids have been "generally very laborious." Appellants state in the specification

* * * By these processes, esters of enols of the series of androstane have been prepared. For example, the 2,17-diacetoxy - 3 - oxo - Δ¹, ⁴ - androsta-diene has been prepared by oxidation of the 2α-hydroxy testosterone with bismuth trioxide at an elevated temperature and by esterification of the oxidized product with acetic anhydride [Baran J. Am. Chem. Soc. 80, 1687 (1958)].

On the other hand, the Δ¹-2-hydroxy steroids of the androstane series can be obtained by microbiological methods starting from the 2α-hydroxy testosterone and the dehydrogenated product can be esterified as has been described previously. [Gual et al, J. Org. Chem. 24, 418 (1959)].

Other processes for obtaining the 2-enols of 2,3-diones are found in the literature, such as oxidation of a 3-oxo steroid by means of selenium dioxide

with production of the corresponding Δ¹-2-hydroxyl compound [Stiller et al, J. Chem. Soc., 353 (1938)] and the condensation of a bromide of the 2-pyridinium compound with the p-nitroso-dimethyl aniline and hydrolysis of the resulting nitrone [Ruzicka, Helv. Chim. Acta 27, 524 (1944)].

In contrast, appellants' method, as they note in the specification, is quite "simple and advantageous because it gives high yields while operating at room temperatures for both steps of the process."

Appellants start with a corresponding 2,4-dibromo derivative [1] of the pregnane, reacting it with pyridine to obtain the corresponding 2-pyridinium-4-bromo-pregnane-3-one, and reacting that pyridinium intermediate with an alkaline salt of a lower organic carboxylic acid having 1–7 carbon atoms (e. g., sodium acetate) in the presence of an N,N-di-alkylamide of a lower alkanoic acid (e. g., dimethyl formamide). Thus, claim 12 reads:

12. A process for the preparation of lower organic carboxylic acid esters of 2-enols of Δ¹-pregnene-3-one having the formula

wherein X is selected from the group consisting of hydrogen and methyl, Y is selected from the group consisting of hydrogen and an acyloxy radical of a lower organic carboxylic acid having 1 to 7 carbon atoms and Y′ is an acyl radical of a lower organic carboxylic acid having 1 to 7 carbon atoms which comprises reacting pyridine with the

---

1. In the case of the 2,21-diacetoxy–Δ¹-pregnene-17α-ol-3,11,20-trione, the starting derivative is disclosed in U. S. patent 2,888,472, and in the case of the

2-acetoxy, 16α-methyl compound, the starting derivative is disclosed in 80 J. Am.Chem.Soc. 3160 (1958).

2,4-dibromo derivative of a pregnane having the formula

wherein X and Y have the above definitions to form the corresponding bromide of the 2-pyridinum-4-bromo derivative of the said pregnane, reacting the latter with a salt of a lower organic carboxylic acid having 1 to 7 carbon atoms in the presence of an N,N-dilower alkyl amide of a lower alkanoic acid to form the lower organic carboxylic acid esters of the said 2-enols and recovering the latter.

Appellants' Table I is reproduced here, with numbers labelling the processing steps added, to further explain the invention:

TABLE I

The added letters represent products referred to in the diagram previously discussed.

wherein X = CH₃- or H-,

$Y = $ H- or acyloxy radical of a lower organic carboxylic acid having 1 to 7 carbon atoms,

and Y′ is an acyl radical of a lower organic carboxylic acid having 1 to 7 carbon atoms.

Referring to the table above, appellants' claimed process covers steps 1 and 2.

Thus the claimed process converts a starting material A to an intermediary B which, in turn, is converted to the claimed product C.

Appellants' product C, an ester of the 2-position enol, may itself be converted to a compound D by acid hydrolysis. Compound D is variously called a 2,3-dione, a 2,3 diketo steroid or a 2,3,11,20-

tetraone. Appellants have presented no claims directed to the conversion step [3] between the esters C and ketones D.

Besides the utility of the process as a means for placing an ester group in the 2-position of such steroid molecules, appellants' application discloses that:

The products obtained by the invention, the lower organic carboxylic acid esters of enols in the 2-position of $\Delta^{1}$-steroids are particularly useful as intermediates in the preparation of steroids, especially steroids having a ketone group in the 2-position, such as 21 - acetoxy - pregnane - 17α - ol - 2,3,-11,20-tetraone and 16α-methyl-preg-

nane-17α-ol-2,3,11,20-tetraone by acid hydrolysis and customary separation steps.

Although the examiner finally rejected all the claims for failure "to present an adequate disclosure of utility as required by 35 U.S.C. § 112 * * *," he also noted that the "2-keto compounds [the tetraones] * * * have no known utility."

Applicants in reply stated, inter alia:

Applicants also wish to point out that 2,3–diketo steroids are known to be useful in the formation of A-nor steroids according to the following reaction:

One skilled in the art would know that the 2,3,11,20-tetraones made from the claimed intermediates could be used to form the corresponding A-nor steroids.

The examiner adhered to his position and appellants *then* appealed to the board. The examiner's position in his Answer on appeal remained the same:

* * * Nowhere in the specification have the applicants alleged or made any reference to a useful property possessed by the *instant* 2-keto compounds, that result from the above stated reaction. The fact is not controverted that the applicants have shown a method of converting the claimed compounds into another compound; however, it is maintained that the final product has not been shown to possess any specific utility that would be readily apparent to those skilled in the art. It is obvious that most compounds can be converted or modified

in some manner; however, such a conversion is not deemed to be a basis upon which an applicant may base an assumption of utility and thus satisfy the requirements of section 112 of the Code. As the application now stands, those engaged in the steroid field would be left totally uninformed as to what could be done with the applicants' final products and would be forced to perform further research on their own, to render the compounds of value in the art. * * *

The examiner also distinguished In re Nelson, 280 F.2d 172, 47 CCPA 1031, on the grounds that the claimed end product, 14-hydroxy-androstenes, in *Nelson* could be used in well-known reactions to produce steroids of a class at least some members of which are known to have useful therapeutic properties. The examiner stated:

A situation comparable to the above does not exist in the application under

consideration. Novelty of the claimed compounds is not questioned, however the claimed 2-enols of the $\Delta^1$-pregnenes do not belong *to a class of compounds known to have the therapeutic properties* or any other readily apparent utility. The identical situation exists relative to the corresponding 2,3-keto compounds which the applicants derive from the claimed compounds by acid hydrolysis and customary separation. While it is possible that through further research, efforts by others may develop important uses for the claimed compounds, it cannot be disputed that no such disclosure exists in the specification as filed nor are such useful ends readily apparent to those skilled in the art.

The board recognized that if satisfactory utility for the products had been established all the claims would be patentable. The board, however, for the first time mentioned 35 U.S.C. § 101 and all but dropped section 112. Regarding *Nelson,* the board stated:

\* \* \* However, absent a situation where an applicant is seeking the same claims on the same disclosure as was involved in the cited case, the Nelson et al. decision cannot be regarded as controlling on facts. Each case must of necessity, be determined in view of its own particular facts.

Regarding appellants' assertion that the 2,3-diketo compounds could be converted to A-nor compounds by known procedures, the board was of the view that they were merely postulated reactions having no support in publications or patents to show that they were known prior to appellants' filing date. The board also noted that the reactions were not disclosed in the specification as filed, that there was nothing to show the reactions in fact could be successfully accomplished, and that there was no showing that the ultimate A-nor compounds "have any utility."