54 CCPA

**Application of Edward M. JONES.**

**Patent Appeal No. 7732.**

United States Court of Customs and Patent Appeals.

March 16, 1967.

Marshall A. Burmeister, Chicago, Ill., for appellant.

Joseph Schimmel, Washington, D. C., (Jere W. Sears, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, RICH, SMITH, and ALMOND, Judges, and Judge WILLIAM H. KIRKPATRICK.*

RICH, Judge.

This appeal is from a decision of the Patent Office Board of Appeals, adhered to on reconsideration, affirming the rejection of claims 1–10 of application serial No. 659,717, filed May 16, 1957, entitled "Non-Linear Code Member." No claim has been allowed.

Claims 1–5 and 7 are directed to a code disc per se and claims 6 and 8 set forth a "method of encoding analog information into digital values" utilizing the disc. Claims 9 and 10 are directed to combinations of elements of an "analog-to-digital encoder" in which the disc is one of the elements.[1]

---

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

1. It may be of some help in understanding this somewhat obscure invention to have in mind the following definitions from Webster's Seventh New Collegiate Dictionary:

ANALOGUE COMPUTER n: a calculating machine that operates with numbers represented by directly measurable quantities (as voltages, resistances, or rotations).
DIGITAL COMPUTER n: A computer that operates with numbers expressed directly as digits in a decimal, binary, or other system.

The examiner made four separate rejections: (1) Claims 1–8 were rejected as unpatentable over Schmidt patent 2,-907,996 of October 6, 1959 (copending). This patent would appear to have issued on application serial No. 512,032, filed May 31, 1955, by Vernon E. Schmidt, referred to in the application at bar, and was assigned to D. H. Baldwin Company, assignee of the present application. For reasons we need not recite, the board found Schmidt not to be a prior art reference and reversed this rejection. (2) Claims 1–8 were rejected further as "non-statutory being for printed matter and depicting merely a concept of a number system to the base 2." The board affirmed this rejection. (3) Claims 6 and 8 were further rejected "as for an improper method claim" in being for the function of the apparatus. The board reversed this rejection. (4) Claims 9 and 10 were rejected as based on new matter attempted to be inserted by an amendment which was refused entry. The board affirmed this rejection. The appeal raises the issue of the propriety of rejections (2) and (4). By reason of their nature, no prior art is relied on and none is of record here, other than that admitted in the application.

### The Invention

We shall undertake to describe the invention, as we understand it, only sufficiently to make clear what the legal issue is with respect to rejection (2), supra. The "code member" may be in the form of a rotating disc and the specification states that in such form it may be employed in angular position encoders of the type described by Bernard Lippel in an article entitled "A High-Precision Analog-to-Digital Converter," Proceedings of the National Electronics Conference, Vol. 7, pp. 206–215, Feb. 1952, from which article appellant's brief has extracted the following illustration to aid in explanation:

Fig. 1—Optical encoder.

In this illustration, the lamp produces, along a radius of the disc, a line of light which may pass through one or more transparent areas of the disc represented by the dark areas. On the other side of the disc from the lamp is a slit behind which are photocells in line with the coaxial tracks, five as shown, on which the transparent areas are positioned. The disc is, in effect, divided into a plurality of narrow pie-shaped sectors equal in number to the number of transparent and opaque areas in the finest divided track, which is shown as the outermost track. For each sector the combination of transparent and opaque areas contained therein is unique. Thus, if the lamp is flashed, the angular rotation of the disc from a reference point can be read out through the photocells by reason of their responses to either light or darkness (no light). The disc above shown appears to have a linear pattern but appellant states in his specification that the use of non-linear code patterns was known, from which may be directly read out binary numbers corresponding to a trigonomeric function of an angle of displacement of a shaft from a nominal position, such non-linearity being a limitation of the appealed claims. For example, the shaft and disc angular rotation from a zero point (or "fiducial mark") may be expressed as the sine of the angle, in the form of a binary number as read by the photocells from the transparent and opaque areas in the segment underlying the slit at the time of illumination.

Appellant's application contains the following drawing, Fig. 1 on the left being half of a prior art disc and Fig. 2 on the right illustrating the improvement thereon in accordance with the invention:

Counting in from the periphery, it will be noted that in Fig. 1 on the left there are five concentric tracks 22, 24, 26, 28, and 30 portions of which are opaque as indicated by the heavy lines. Where there is no line it is to be assumed the track is transparent, i. e., light would be transmitted to an overlying photocell. A read-out along a horizontal radius through the zero point on this disc would encounter all dark areas and the binary number result would be 00000. The sixth track, 32, the opaque portion of which terminates, theoretically, exactly on the radius passing through the zero point, or center of zero segment 31, is shown as opaque for positive (+) numbers and transparent for negative (−) numbers and is known as the "sign track" (not to be confused with "sine") and indicates whether the number read-out is positive or negative.

Appellant's specification thus states a problem encountered in making and using the prior art Fig. 1 disc, which problem the invention is said to solve:

In the distribution of code patterns in a logical manner, as is the prior practice, to provide for non-linear codes such as would correspond to the sine of an angle, the code pattern will contain in its track corresponding to the *least-significant* digit, a fiducial mark or segment representing zero degrees (and also 180°, as the disk is symmetrical about the 90°−270° axis). In line with such marks is usually found a transition between a section of a concentric track on the disk corresponding to the *positive* sign of a trigonometric function and a portion corresponding to a *negative* sign. In the code representation, the least significant digit pattern is one quantum wide,

and in the ideal disk the transition from positive to negative sign occurs exactly in the center. Consequently, as will be explained in detail hereinafter, not only will an error of as much as two quanta be produced if the sign-pattern transition is more than one-half quantum in error from its ideal position, but also, an ambiguity will exist.

This general statement is made more specific later in the specification:

Disks of the prior art type illustrated in Figure 1 have met service demands wherein the number of digits required is relatively low. In disks approaching the accuracies of the order of $2^{16}$, which may be produced by apparatus of the type disclosed in a co-pending application Serial No. 512,-032, filed May 31, 1955, in the name of Vernon E. Schmidt, entitled Code Generator, assigned to the same assignee, the quantum distance, such as that represented in the sector "+1" in Figure 1, becomes of the same order of accuracy as the location of the boundary between the plus and minus segments of the sign track 32. If, for example, the boundary between the + and − segments of the track is displaced downward slightly, so as to occur in a radial line corresponding to a position slightly below the "−0" sector, the number read out would be 00001, which is the correct *number* but the *sign* would be read out as *positive*. Therefore, an ambiguity would arise in which the *same* number would be read out for both the −1 and the +1 sectors of the disk.

\* \* \* \* \* \*

Thus in prior art disks, laid out in the logical manner, with each number represented on the disk by one quantum, there resides this possibility of larger than normal errors in the vicinity of "0" in high accuracy disks.

The gist of the invention is contained in the following two paragraphs of the description:

The basic concept of my invention lies in the deliberate introduction of a half-quantum error in the distribution of the patterns upon the code member, such as the disk illustrated in Figure 2. As will be explained in greater detail hereinafter, since this deliberately-introduced error exists around the entire disk, provision can be made easily in the read-out equipment for correcting this error. Thus the possible ambiguities due to slight errors in the pattern are removed, and disks of higher accuracy, for a given size, are achieved.

Referring now to the details of Figure 2, the disk of my invention is represented in part at 34, it not being necessary to illustrate the remainder, because of symmetry. The disk 34 has plus and minus segments in a track 32' (corresponding elements in the disk of Figure 1 and Figure 2 have corresponding base numbers). Tracks corresponding to Figure 1 are illustrated at 24', 26' 28', and 30'. These tracks represent from 24' to 30', respectively, the most-significant to least-significant digits of the number corresponding to the position [sic] of a disk from the zero position. The fiducial mark 31' can be seen as being two quanta in length, whereas the prior art fiducial mark 31 (in Figure 1) is 1 quantum in length.

Appellant's brief summarizes the invention and its advantage thus:

Figure 2 of this application shows the present invention in which the "0" sector is made twice as long as numerical calculations would make it, that is, twice as long as the prior art "0" sector shown in Figure 1 (Tr. 8). As a result, the code disc of the present invention may be displaced from the zero or nominal position up to one-half of the sector length further without producing a change in the electrical output. This error is carried about the entire disc, so that each and every output of the disc is low by one half count. The electrical output of the code disc may then be made accurate by simply adding one half count to the numerical output.

As the brief also points out, and it is not disputed, the "0" sector in the "least

significant" outer track has the shortest arc length and it is this length that limits the possible resolution of the disc because the transition point of the innermost sector which indicates plus or minus must be accurately aligned with the center of the shortest outermost sector. By doubling its length, and then electrically compensating for the error thus deliberately introduced, appellant has solved a problem by what seems to us to be a structural change in the disc, which also brings about a new dimensional and hence functional relationship between the shortest segment in the outer track and the transition point in the innermost track, allowing greater latitude in positioning the latter.

Illustrative of the disc claims is claim 1:

1. In a code member of the type wherein a plurality of series of pattern areas are arranged for line readout of non-linear code numbers representative of displacements of said member from a nominal position, a series of areas in said plurality having at least one area which is bisected by the line readout at said nominal position and which extends one quantum distance in both directions from said nominal position, the remaining areas in said series being also two quanta in length, and at least two additional sign-determining areas whose boundary occurs at said nominal position.

■■ That claim, and the others likewise, do not, in our opinion, define "printed matter" in the sense in which that term has heretofore been used to indicate various sorts of indicia whose primary purpose is the conveying of intelligence to a reader. What we find

on the disc we would not characterize as indicia or printing but as structure, albeit the "pattern areas" of claim 1 are not necessarily transparent and opaque, respectively, and might be produced by some sort of printing technique. A dark area on a light base can be an element of structure. See the note entitled "The Patentability of Printed Matter: Critique and Proposal," 18 George Washington L.Rev. 475, 484, June 1950.[2] In the claims other than claim 1 the tracks are made up of transparent and opaque areas.

*Opinion*

■■ We shall consider first the rejection of claims 1–8 as "non-statutory." The board said of them:

Claims 1 to 5 and 7 set forth a code disc and claims 6 and 8 set forth a method of making a code disc * * *.

The statement is in accord with the record except as to claims 6 and 8. We agree with appellant's statement that

These claims are directed to this method of generating an output with a code disc, such as set forth in the subcombination claims * * * 1 through 5 and 7, and thereafter "adding a binary '½' from the binary number represented by the other tracks to give a digital number representing the trigonomeric function of the analog information."

Notwithstanding this preliminary error in appraisal, the entire group of claims is under rejection on the same ground, non-statutory subject matter, in that they are not directed, in the board's words, to "a novel structure or physical process required under 35 U.S.C. 101." The statutory language with which we are concerned is, of course, "process, machine, manufacture, or composition of matter, or any new and useful improvement

2. The paragraph we have particularly in mind reads:

Printed matter can, of course, produce physical results as in an optical instrument such as an actinometer or a grating where lines diffract or otherwise produce an optical effect on light. Another device in which printed matters produces physical results is where printed marks actuate a photo-electric

cell. Similarly, if an arrangement of lines is used for sighting as in a telescope reticule [sic, reticle], it is also physical structure. There has been no suggestion in any decision or legal commentary that the arrangement of printed matter in such situations is nonpatentable even if it constitutes a mathematical arrangement.

thereof * * *." As to the claims to the disc, the relevant terms are either machine or manufacture. Appellant regards these claims, correctly we think, as directed to either a manufacture or to a "subcombination" of a machine. Claims 6 and 8 he deems to be within the term process as defined in 35 U.S.C. § 100(b), the pertinent part of which says, "The term 'process' means process, art or method * * *." In terms, these claims are to "The method of encoding analog information into digital values corresponding to the trigonometric function of the analog information comprising" certain steps thereafter defined, including use of a disc of the kind defined in the disc claims.

The examiner's basis of rejection as stated in his Answer was that claims 1–8 are "drawn to non-statutory subject matter in accordance with In re Sterling, 1934, CD 494," 70 F.2d 910, 21 CCPA 1134. We have considered that case and fail to see that it supports the rejection. It involved claims to a "savings check" or a check book containing savings checks at intervals. This court found, first of all, that the claims were unpatentable over the prior art. The savings check, subject of claim 1, was the only novel feature of the check book claims. The opinion says:

> Considering claim 1, * * * the physical structure is practically the same as the corresponding physical structure of Watrous. The *language* printed upon the respective checks and stubs differs, but we have held in a number of cases that the mere arrangement of printed matter on a sheet or sheets of *paper* does not constitute patentable subject-matter. * * * [cases cited] if arrangement of printed matter may not constitute patentable novelty, it would seem obvious that the *substance or language* of that which is printed may not do so. [Emphasis ours.]

The court then distinguished, as it had in a prior case, the famous streetcar transfer ticket case, Cincinnati Traction Co. v. Pope, 210 F. 443 (6th Cir. 1913), where the *arrangement* of printed matter, as distinguished from the intelligence conveyed by the words, provided, in relation to the transfer, a new structural facility and was held patentable.

Certainly there is no "printing" in this case in the form of words or other symbols intended to convey intelligence to a reader nor in the form of rulings as on a business form. The user of the disc is not supposed to contemplate it as he would a mathematical table, weighing scale chart, or the like in order to derive some information. The disc is devised, made and used as a component part of a machine utilizing optics and electronics to perform functions of which we are not fully apprised by the record. We think it is error to confuse the lines on a patent drawing, which may have the appearance of "printed matter," with functional elements of a mechanism which in use actuate other mechanisms or electrical circuits or devices intended to be illustrated by the drawing. We see no basis for applying the *Sterling* case here.

The board did not mention the *Sterling* case but cited two others in support of the rejection, Ex parte Gwinn, 112 USPQ 439 (Bd. App.) and Ex parte Jenny, 130 USPQ 318 (Bd. App.). *Gwinn* is a lengthy opinion dealing with the patentability of a "parlor golf" game using dice having the usual spots on them, possibly with some variations like blank faces and colors. Apparently the dice, the only apparatus involved, were found to be wholly lacking in patentable features, the rules of the game being found irrelevant to patentability. The solicitor, remarking that we have never commented on that case, extracts from it two principles therein stated which he approvingly indicates were applied here by the board. They are:

> (A) that where the *sole* distinction set out in the claims over the prior art is in the printed matter, there being *no new feature* of physical structure and *no new relation* of printed

matter to physical structure, such claims may not be allowed; * * *

(B) that it is only where the claims define *either* new features of structure *or* new relations of printed matter to structure, *or* which new features or new relations give rise to some new and useful function or effect or result that claims may properly be allowed. (Emphasis by the Board)

We have no quarrel with these statements as a summary of the cases on which they were based but they are uncritical with respect to how one determines whether certain "printed matter" is also "structure." We do not consider them to be controlling in this case for the reason that what the Patent Office deems to be printed matter in the disc we consider to be structure. Anyway there is nothing in this case comparable to the dice involved in *Gwinn* and no printed rules are involved either. *Jenny* involved a method of changing "field intensity profiles" into "a high resolution function field intensity profile map on graph paper." The rejection sustained was on the ground that the claimed method consisted of steps which are "mental, conventional drafting practice, and printed matter." The three steps of the method were (1) "chording" the curve to reduce gross changes, (2) "splining" the chorded curve which is merely averaging out the rapid variations, and (3) "plotting" curves representing the difference between the splined curve and its original profile. We see no relevance of the holding of unpatentability of such a method to the issue here. The disc and the method of its use here claimed do not appear to us to involve any mental steps with the possible exception of the final step in method claims 6 and 8, "adding a binary '½' from the binary number represented by the other tracks" to the readout. The appellant does not propose to make this addition mentally but by making provision therefor in the readout *equipment*. The solicitor's point is that we should regard it as a mental step in the absence of a disclosure of some actual means to accomplish this step in

the application. He cites In re Abrams, 188 F.2d 165, 38 CCPA 945, which was also discussed and relied on in *Jenny*, supra, on which the solicitor does not rely. Since we are dealing with the rejection that the claims are non-statutory, and since we find in claims 6 and 8 as much as in the other claims to the disc which we consider to be statutory, we do not feel that the single possibly mental step of addition is sufficient to make them subject to this rejection. Absent this step, the claims would not be non-statutory; they are not rendered so by its addition.

■■ Claims 9 and 10 are rejected only on the ground of new matter. The rejection is predicated on the presence in the claims, which were added late in the prosecution together with an attempt to add to the specification, of "*means* for adding an electrical potential equal to one-half of the electrical potential representing a quantum electrically connected to the photocells confronting the other tracks of the code disc." (Our emphasis. Claim 10 words it somewhat differently.) Appellant does not deny that he fails to disclose the means but says it was either disclosed in the Lippel article or would be obvious to one of ordinary skill in the art. Appellant cannot positively claim what he has not disclosed and he has disclosed no means. We will affirm this rejection.

The decision of the board is reversed as to claims 1–8 and affirmed as to claims 9 and 10.

Modified.

KIRKPATRICK, Judge (dissenting).

I find myself unable to agree with the majority.

The change in the pattern of the prior art disc consists of doubling the length of the zero indication along the edge of the disc. This is important because, if the pattern is intended to represent the sine of the angle, the plus or minus sign of the number will change at this point, and a mistake as to the sign would lead to a reading of, say, three degrees instead of 357 degrees of rotation. The ap-

plicant avoids such large errors by electing to tolerate an inability to detect accurately a minute rotation near the zero point. As a result of lengthening the zero mark and continuing the same spacing around the edge of the disc as existed in the prior art, when the scale or pattern on the disc is read, it will always read one-half lower than it would have read if the original pattern had been undisturbed. I do not think that this change of pattern is a change in an article of manufacture.

I attach no significance to the fact that the scale or pattern is to be read by a bank of photo cells instead of the human eye. I have difficulty in distinguishing the subject matter said to be patentable from the arrangements of numbers on the dial of an ordinary bathroom scale. Certainly, the method of reading it should not be controlling.